OPINION OF THE COURT
Robert A. Sackett, J.
In this combined CPLR article 78 proceeding and complaint, petitioners-plaintiffs challenge three conditions included in the Clean Water Act Section 401 Certification for Commercial Vessel and Large Recreational Vessel General Permit (the 401 Certification) issued by the New York State Department of Environmental Conservation (DEC) on November 3, 2008 and seek an order severing and vacating conditions one, two and three of the 401 Certification; declaring that the 401 Certification does not apply to simple transit through New York State waters but only to the discharge of pollutants from vessels covered under the Clean Water Act National Pollutant Discharge Elimination System Vessel General Permit (VGP) into New York waters; and directing the DEC to promptly forward a revised 401 Certification without conditions one, two and three to the U.S. Environmental Protection Agency (EPA) for inclusion in the VGP Respondents oppose the petition-complaint. The Natural Resources Defense Council and the National Wildlife Federation, intervenors, granted permission by order of this court dated March 13, 2009, filed a memorandum of law in opposition.
At the time when the petition and complaint were commenced, the EPA was scheduled to sign a Clean Water Act National Pollutant Discharge Elimination System Vessel General Permit, required by a recent change in federal law (see Northwest Envtl. Advocates v United States Envtl. Protection Agency, 537 F3d 1006 [9th Cir 2008]), which authorized discharge of pollutants incidental to normal operation of all commercial and large recreational vessels beginning on or about December 19, 2009. On August 6, 2008, in order for the VGP to take effect in New York State’s waters, the DEC issued the first *1044 draft 401 Certification which included five conditions for operation of commercial and larger recreational vessels in New York State’s waters — even if the vessels do not discharge pollutants. After two drafts, each with public notice and a public comment period, a revised final VGP with New York’s 401 Certification was issued on February 5, 2009. Only conditions one, two and three (the conditions) are at issue herein.*
As finally issued in the revised final VGF condition one essentially requires that all ships entering New York waters with ballast water on board must travel 50 nautical miles from the coastal shore into the Atlantic Ocean into waters at least 200 meters in depth in order to exchange the water in their ballast tanks with ocean salt water, to maintain the ability to measure salinity levels in the ballast tanks and to maintain salinity levels in each ballast tank of at least 30 parts per thousand.
Condition one does not apply to freshwater “laker” freight vessels that serve only the Great Lakes-St. Lawrence Seaway System (defined in more particular terms as commencing at the mouth of the St. Lawrence River); vessels that operate exclusively within the waters of New York Harbor or Long Island Sound (as defined as most particularly concerns this petition, in the Hudson River south of the Tappan Zee Bridge); vessels that enter New York waters from ports within New Jersey and Connecticut waters which are within the definition of waters of New York Harbor and Long Island Sound, provided that the vessel has met the requirements of the condition prior to entering the waters of New York Harbor and Long Island Sound; vessels that carry only permanently sealed ballast water tanks that are not subject to discharge; vessels that meet the requirements of conditions two and three; vessels that are part of the National Defense Reserve Fleet scheduled to be disposed of through scrapping or sinking; vessels for which the master of the vessel determines that compliance threatens the safety or stability of the vessel, takes reasonable measures to avoid discharge of organisms in ballast water and so informs the DEC.
Condition two requires that by 2012, all existing ships covered by the VGP and operating in New York waters must be retrofitted to install ballast water treatment systems meeting specifically established standards for organism and microbe content; exclusions are provided for vessels operating within New York *1045 Harbor and Long Island Sound, for vessels that carry only permanently sealed ballast water tanks and for the National Defense Reserve Fleet as in condition one. Extensions may be applied for if the required technology is unavailable.
Condition three requires that all vessels constructed after January 1, 2013 that are covered by the VGP and operating in New York waters must include a ballast water treatment system meeting specifically established standards for organism and microbe content (as in condition two); the same exclusions apply as in condition two. Extensions may be applied for if the required technology is unavailable.
Petitioners-plaintiffs argue that three conditions are unlawful because in adopting them, the DEC: (1) bypassed the State Administrative Procedure Act and the procedural and substantive requirements of ECL articles 3 and 17; (2) exceeded the DEC’s existing legislative authority; (3) violated the State Environmental Quality Review Act (SEQRA); (4) will impermissibly burden interstate and foreign commerce in violation of United States Constitution articles I and II; and (5) unlawfully promulgated requirements that were arbitrary, capricious and a clear abuse of discretion. More specifically, petitioners-plaintiffs maintain that the conditions are not based on any New York State law or DEC regulation; and that prior to the adoption of the conditions only a two-week comment period was afforded, no hearings were held, no economic and technological analyses required by the State Administrative Procedure Act and the ECL were conducted and no environmental review was undertaken as required by SEQRA.
Petitioners-plaintiffs’ arguments concerning the harm to commerce in New York ports in the Great Lakes-St. Lawrence Seaway is largely rendered moot by the final version of condition one containing the exception for “laker” vessels.
As to oceangoing vessels, petitioners-plaintiffs assert that the three conditions will force oceangoing cargo ships to avoid Upstate New York waters altogether and to divert to other ports not in New York State or to unload their cargo in New York Harbor for further land transit, rather than going up the Hudson River to the Port of Albany. They argue that this will result in significant loss of business and environmental and economic harm to New York municipalities and residents, including Albany, New York, and the already economically fragile ports in the Great Lakes and St. Lawrence Seaway. The three conditions also will allegedly impact intrastate and international water *1046 course transit, resulting in allegedly significant environmental and economic impacts to other Great Lakes states and to Canada. They also argue that technologies do not presently exist which will afford compliance with conditions two and three.
The DEC argues that conditions one, two and three are properly based on water quality standards consisting of broad narrative criteria set forth in state law, in addition to more narrowly defined numerical criteria, as may be established by state regulations (citing PUD No. 1 of Jefferson Cty. v Washington Dept. of Ecology, 511 US 700, 715-716 [1994]). The DEC cites the narrative water quality criteria in 6 NYCRR 703.2, which establishes the water quality standard applicable to the various classifications of the State’s waters and limits the amount of toxic and other deleterious substances to “[n]one in amounts that will . . . impair the waters for their best usages”; and 6 NYCRR part 701, which designates the best uses for each classification of the State’s waters. 6 NYCRR 701.2 and 701.3 also provide the narrative standards for class N fresh surface waters and class AA-Special fresh surface waters, respectively, and establish that the there will be no deleterious substances in those waters. The DEC argues that these narrative criteria are broadly defined so as to be capable of including specific pollutants not foreseen when the regulations were enacted (citing Islander E. Pipeline Co., LLC v McCarthy, 525 F3d 141, 144-145 [2d Cir 2008]). The DEC asserts that these narrative water quality criteria and designated uses are long-standing and duly promulgated statutory and regulatory authority; therefore, it had the authority in existing law, without the requirement of a new State Administrative Procedure Act procedure, to adopt the conditions. It also asserts that SEQRA procedure was followed, resulting in the issuance of a negative declaration as no significant adverse impact to the environment was anticipated by the adoption of the conditions.
Finally, the DEC argues that petitioners-plaintiffs’ assertions that the conditions do more harm to the environment than good and are harmful to the ships’ occupants are conclusory and unsupported by scientific and other expert evidence. Additionally, ballast water treatment system technologies which will allow compliance with conditions two and three are presently in development and extensions in the conditions allow for any delays which may occur in the marketing of these technologies.
In reviewing administrative action, the court may not substitute its judgment for that of the agency responsible for *1047 making the determination, but must ascertain only whether the administrative determination is rational and supported by the record (see Flacke v Onondaga Landfill Sys., 69 NY2d 355, 363 [1987]; Matter of Plante v New York State Dept. of Envtl. Conservation, 277 AD2d 639 [3d Dept 2000]).
In reviewing an agency determination pursuant to SEQRA, “it is not the role of the courts to weigh the desirability of any action or choose among alternatives, but to assure that the agency itself has satisfied SEQRA, procedurally and substantively” (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 416 [1986]). The agency’s decision must be upheld if it is supported by a rational basis (see Matter of County of Monroe v Kaladjian, 83 NY2d 185, 189 [1994]). The pertinent inquiry is “whether the agency identified the relevant areas of environmental concern, took a ‘hard look’ at them, and made a ‘reasoned elaboration’ of the basis for its determination” (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417 [1986]; see Matter of Gernatt Asphalt Prods. v Town of Sardinia, 87 NY2d 668, 688 [1996]). The extent to which particular environmental factors are to be considered varies in accordance with the circumstances and nature of particular proposals (Akpan v Koch, 75 NY2d 561, 570 [1990]; see Matter of Save the Pine Bush v Planning Bd. of City of Albany, 298 AD2d 806, 807 [3d Dept 2002]).
Conditions may be added to the 401 Certification which set forth limitations and monitoring requirements necessary to ensure compliance with the Clean Water Act and with “any other appropriate requirement of State law set forth in such certification” (33 USC § 1341 [d]). In accordance with the federal mandate, the 401 Certification refers to applicable provisions of ECL article 17 (“Water Pollution Control”) and 6 NYCRR part 700 et seq. as authority for the conditions. As more particularly stated in the conditions, ECL article 17 and the regulations promulgated pursuant thereto clearly define “pollutant” and “pollution” (ECL 17-0105 [17]; 6 NYCRR 700.1 [a] [47]); define effluent limitations to control unlawful discharges (ECL 17-0105 [15]; 6 NYCRR 700.1 [a] [15]); and develop water quality standards designed to protect New York State’s waters from pollution and its deleterious effects by classifying water systems within the State, establishing best usages for each classification and establishing water quality criteria which will maintain and protect the waters for their best usages (ECL 17-0301; 6 NYCRR parts 701, 703). These statutes and regulations *1048 have been in existence and essentially unchanged since the 1970s.
By letter dated July 9, 2008, the EPA requested that the State submit its 401 Certification for the subject VGP This letter was treated by the DEC as a permit application pursuant to 6 NYCRR 621.1 (e) and 621.2 (u). EPA required the State to submit its Certification within 60 days of the date of EPA’s mailing of the draft permit (see 40 CFR 124.53 [c] [3]), that is 60 days from June 17, 2008. The State requested and was granted two extensions of time in order to prepare two draft 401 Certifications and to comply with the notice and comment provisions of 6 NYCRR 621.7 for each. For each draft 401 Certification, public notice was published in the Environmental Notice Bulletin (August 6, 2008 and October 8, 2008, respectively) and in general circulation newspapers in the communities affected by the permit (August 14, 2008 and October 14, 2008, respectively); public comment periods were provided following each notice in compliance with 6 NYCRR 621.7 (b) (6) (i). The DEC also issued responses to the public comments with the final revised draft. The final 401 Certification with responses formed the basis for the DEC’s negative declaration pursuant to SEQRA. The public notice and comment procedures satisfied the SEQRA requirements for a public hearing.
As a result of the certification adoption process and the first comment period, the original draft of the conditions were significantly amended in response to comments by petitioners-plaintiffs and others. Notably, the exception for “laker” vessels was added and the distance required for other vessels to enter the ocean for the ballast water exchange was reduced from 200 miles in the initial draft to 50 nautical miles in the final 401 Certification. “Laker” vessel commerce is, therefore, not affected by condition one. Vessels crossing the Atlantic Ocean are not required to alter course, only to make the ballast water exchange 50 nautical miles offshore. For oceangoing vessels traversing the east coast of the United States, the DEC reasonably determined that the requirement of veering 50 nautical miles into the ocean in order to flush the ballast tanks is not so onerous as to significantly preclude vessel traffic into the St. Lawrence Seaway or into the Hudson River north of the Tap-pan Zee Bridge.
It is undisputed that ballast water on oceangoing vessels subject to the 401 Certification is a source of significant potential and actual biological pollution for the State’s water *1049 systems, in the form of harmful aquatic invasive species (AIS). As set forth in the expert affidavits of DEC employees, the DEC has determined that this AIS pollution can be controlled by the ballast water exchange procedures set forth in condition one and by the eventual use of ballast water treatment systems provided for in conditions two and three. They have also determined that narrative water quality standards, such as are established by 6 NYCRR 703.2, are an effective and reasonable tool for controlling water system pollutants which are vastly numerous, ever changing and for which there are no numerical criteria available.
Further, the DEC determined that there is no significant increase in energy usage attributable to the conditions; that there is no evidence that ballast treatment systems will result in harmful chemical discharges into the waterways as the vessels remain subject to state and federal water quality standards; that scrapping of ships and replacing or installing ballast water treatment systems are subject to waste handling, recycling and disposal systems presently in place; that there was no evidence that ballast water flushing or treatments would result in harm to occupants of the vessels; and that the argument that shipping patterns and methods would change to the detriment of petitioners is speculative and unsupported by the evidence.
The negative declaration states that the phased approach to ballast water flushing and treatment reasonably and effectively addresses the economic and logistical factors associated with protecting the State’s waters from harmful AIS and microbes; that the ballast discharge standards enunciated in the conditions address the need to protect water quality and fish, shellfish and wildlife propagation in the State’s waters which have been and continue to be at risk from harmful AIS and microbe pollution by maintaining water quality and the best usages of the State’s waters, avoiding continuing and new introduction of harmful AIS and microbes into the State’s water systems and implementing the State’s antidegradation policy; and that the Certification meets the established standards of the Federal Clean Water Act and the State’s water quality standards. The negative declaration also indicates that impact of the Certification on shipping patterns was considered and it was determined that no changes in shipping would occur as a result of the Certification; and that the cost of implementing the conditions would not be prohibitive when amortized over the life of the vessel.
*1050 The court is constrained to defer to the DEC’s interpretation of ECL article 17 and 6 NYCRR parts 700, 701 and 703, as well as to the DEC’s judgment as to the necessity for the conditions as both “involve! ] knowledge and understanding of underlying operational practices or entail! ] an evaluation of factual data and inferences to be drawn therefrom” (see Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980]). Further, the court finds that the existing ECL article 17 and 6 NYCRR parts 700, 701 and 703 are sufficient to support the adoption of the conditions (see PUD No. 1 of Jefferson Cty. v Washington Dept. of Ecology, supra; Islander E. Pipeline Co., LLC v McCarthy, supra) without further State Administrative Procedure Act procedures for the promulgation of new statutes and regulations. Additionally, the court finds that the provisions of ECL article 70 were complied with in the permit application and public comment process.
While the economic impact to a community is a factor to be considered in the SEQRA process, the DEC’s determination that condition one is not significantly onerous for oceangoing vessels is a rationally based determination, especially when compared to the substantial environmental protection provided to the State’s waterways from harmful AIS and pathogens. The court also notes that the safety exception in condition one is available to ensure that no harm will come to vessel occupants because of ballast water flushing.
As to conditions two and three, the DEC’s investigation into technological development of ballast water treatment systems indicates that the time frame provided is realistic. In any event, the conditions contain extension provisions to allow for the availability of technological advancements necessary for compliance.
The DEC also considered the costs of implementing the conditions and found the costs would not be prohibitive for the industry; and that when compared to the costs to combat adverse effects of harmful AIS and microbes, the expense of pollution prevention was not significant.
Within the framework of the above preexisting and duly promulgated water pollution control legislation, the court finds that the conditions are rationally derived from the authority of the DEC to control ballast water pollution. On reviewing the record herein, the court also finds that the permit application process, extended twice in order to provide a more thorough investigation, public notice and public hearing in the form of *1051 the two comment periods, satisfied the procedural requirements of SEQRA; that the record, supported by detailed analysis based on substantial expert evaluation of the impact of the certification on the environment, shows that the DEC took a “hard look” at the environmental and economic effects of the conditions; that the negative declaration, which addresses the impacts that could reasonably be anticipated to occur from implementing the 401 Certification and finds that no significant adverse economic or environmental impact would result, is rationally based; and that the 401 Certification and DEC responses and negative declaration constitute a reasoned elaboration of the bases of that determination.
Therefore, it is ordered and adjudged that the petition-complaint is denied and dismissed in all respects, without costs.

 Conditions four and five concern the discharge of gray water and bilge water.